IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ESTATE OF RICHARD A. KEMPF,** | ) | CIVIL ACTION NO. 15-1125 |
| **JR.,** *Deceased,* AMANDA KEMPF, | ) | |
| Adminstratrix, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **WASHINGTON COUNTY, et al.** | ) | |

## MEMORANDUM OPINION

**Conti, Chief District Judge**

## I. INTRODUCTION

Amanda Kempf, the sister of the decedent, Richard A. Kempf, Jr. (hereinafter "Mr. Kempf" or

"decedent") brought this action as administratrix on behalf of the Estate of Richard A. Kempf, Jr.

(hereinafter "plaintiff").[1]  In the second amended complaint, plaintiff claims that the suicide of Mr.

Kempf, a pretrial detainee, resulted from treatment of Mr. Kempf by Dr. Ravindranath Kolli, M.D.

(hereinafter "Dr. Kolli" or "defendant").  (ECF No. 50 ¶¶ 82, 95).  Specifically, plaintiff sues Dr.

Kolli for: a) a violation of the Fourteenth Amendment to the United States Constitution pursuant

to 42 U.S.C. § 1983 (Count Five); b) professional negligence under Pennsylvania law (Count Six);

c) a state law wrongful death claim under the Pennsylvania Wrongful Death Act, 42 Pa. Cons. Stat.

§ 8301 (second Count Four):[2] and d) a state law survival claim under the Pennsylvania Survival

---

[1] Federal Rule of Civil Procedure 17(a)(1)(B) permits an administrator to bring an action on behalf of the decedent.
Fed. R. Civ. P. 17(a)(1)(B).

[2] In the second amended complaint, plaintiff set forth two counts identified as Count Four and two counts identified
as Count Five.  The first Count Four is against former defendant Southwestern Behavioral Care, Inc. and was
terminated on June 1, 2017.  (ECF No. 77); the second Count Four is pursuant to the wrongful death claim brought
against all defendants; the first Count Five is brought against Dr. Kolli only pursuant to 42 U.S.C. § 1983; and the
second Count Five is a state law survival claim under the Pennsylvania Survival Act against all defendants.  Dr.

Act, 42 Pa. Cons. Stat. § 8302 (second Count Five). This court has jurisdiction pursuant to 28 U.S.C. §§ 1331[3] and 1367.[4]

Pending before the court is the motion for summary judgment (ECF No. 83) filed on behalf of Dr. Kolli with respect to plaintiff's § 1983 claim against him, arguing that there is insufficient evidence that Mr. Kempf had a particular vulnerability to suicide or that Dr. Kolli acted with deliberate indifference to that serious medical need. Defendant urges the court to decline supplemental jurisdiction over plaintiff's state law claims if it grants summary judgment on the federal claim. (ECF No. 84 at 11). Also pending before the court is plaintiff's motion to strike the affidavit of Dr. Kolli, which was filed in support of his motion for summary judgment. (ECF No. 94). As more fully explained below, the motion to strike will be denied, the motion for summary judgment will be denied, and the court will continue to exercise its jurisdiction over the supplemental Pennsylvania law claims. The court concludes that plaintiff adduced sufficient evidence from which a reasonable jury could find that Mr. Kempf possessed a particular vulnerability to suicide and that Dr. Kolli acted with deliberate indifference to Mr. Kempf's serious medical need.

## II.     PROCEDURAL BACKGROUND

Plaintiff instituted this action against Washington County, Pennsylvania, and John Temas, Warden of the Washington County Jail, in the Court of Common Pleas of Washington County, Pennsylvania. (ECF No. 1-3). On August 27, 2015, the case was removed to the United States

---

Kolli is the only defendant remaining in this case; the claims against all other defendants were dismissed. (ECF Nos. 76, 77, 78, 79).

[3] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

[4] Section 1367(a) provides for supplemental jurisdiction over all other related state law claims. 28 U.S.C. § 1367(a).

District Court for the Western District of Pennsylvania. (ECF No. 1). Plaintiff filed a first amended complaint on March 2, 2016, adding James Emler, corrections officer, and Southwest Behavioral Care, Inc. ("Southwest") as defendants. (ECF No. 22). On September 12, 2016, plaintiff filed a second amended complaint, adding Dr. Kolli as a defendant and alleging that Dr. Kolli's actions violated Mr. Kempf's constitutional rights and served as the cause of Mr. Kempf's suicide. (ECF No. 50 ¶¶ 82, 95).

The claims against John Temas were terminated *via* the June 28, 2016 order granting his motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) motion. (6/28/2016 Minute Entry). On April 17, 2017, the court granted plaintiff's voluntary dismissal of Southwest. (ECF No. 77). The claims against Washington County and James Emler were dismissed on June 1, 2017 *via* a stipulation of dismissal. (ECF No. 79). After the close of discovery, Dr. Kolli filed his motion for summary judgment. (ECF No. 83).

In support of his motion, Dr. Kolli filed a brief, (ECF No. 84), a concise statement of material facts, (ECF No. 85), an appendix including Dr. Kolli's affidavit, (ECF No. 83-2), a reply brief, (ECF No. 104), and a reply concise statement of material facts. (ECF No. 105). Plaintiff filed a motion to strike Dr. Kolli's affidavit, (ECF No. 94), a memorandum of law in opposition to the motion for summary judgment, (ECF No. 95), a response concise statement of material facts including additional facts, (ECF No. 97), and an appendix, (ECF No. 102). Defendant filed a memorandum in opposition to plaintiff's motion to strike the affidavit, (ECF No. 98), and plaintiff subsequently filed a reply to defendant's opposition to plaintiff's motion to strike the affidavit. (ECF No. 100).

In accordance with the July 19, 2017 case management order, the parties filed a Combined Concise Statement of Material Facts, (ECF No. 107, hereinafter "CCSMF"), which includes

defendant's concise statement of facts (ECF No. 85), plaintiff's response to the facts asserted by defendant (ECF No. 97) ("Plaintiff's Counter Statement of Material Facts" (PCSMF)), and defendant's responses to plaintiff's counter-statement (ECF No. 105). The CCSMF indicates uncontested facts, disputes about certain facts and disputes about whether a party's response to certain facts asserted are adequate to dispute those facts under the Local Rules of the United States District Court for the Western District of Pennsylvania and the Chambers' Rule of this court. *See* LCvR 56.C.1.a and this court's Chambers' Rule 3.F.c.ii.[5] This matter is fully briefed and ripe for disposition.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted where the moving party shows that there is no genuine dispute of any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in

---

[5] Local Civil Rule of Court 56.B.1 requires the party moving for summary judgment to file a separate concise statement of material facts and requires that the party cite "to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact." LCvR 56.B.1. In further support, the moving party must file an appendix with the documents supporting that party's concise statement of material facts. LCvR 56.B.3. The opposing party must provide a separately filed concise statement admitting or denying the facts in the moving party's concise statement, LCvR 56.C.1.a, setting forth the basis for a denial of the moving party's concise statement with reference to the record, LCvR 56.C.1.b, and providing any additional material facts that are necessary for the court's ruling on the motion. LCvR 56.C.1.c. This court's Chambers' Rule for Pretrial Procedure in Civil Cases 3.F.c.ii also requires that the opposing party file a separate document in response to the moving party's concise statement indicating which facts are disputed and citing and attaching the evidence in support of any disputed facts. Local Civil Rule of Court 56.E specifically provides that the facts claimed to be undisputed and material in a party's concise statement "will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." LCvR 56.E. Thus, in ruling on summary judgment, the court considers the factual record under the standard for determining a motion for summary judgment and in light of these rules.

the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden on a motion for summary judgment is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080 (3d Cir. 1996). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 322, 325; *Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir. 2007).

Once the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Celotex,* 477 U.S. at 323–25. The nonmoving party must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323–24. The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Liberty Lobby,* 477 U.S. at 248–49; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n.3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. *Celotex,* 477 U.S. at 322–23. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. *Liberty Lobby*, 477 U.S. at 249. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every challenged] element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere

allegations, but rather must 'identify those facts of record which would contradict the facts

identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir.2007) (quoting *Port*

*Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002)).  Inferences

based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a

motion for summary judgment.  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir.

1990).


## IV.    MOTION TO STRIKE DR. KOLLI'S AFFIDAVIT TENDERED IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Plaintiff argues in support of the motion to strike Dr. Kolli's affidavit that the affidavit is a

"sham affidavit" based upon Dr. Kolli's deposition testimony.  (ECF No. 94 ¶¶ 4A-4C).  Dr. Kolli

maintains that his affidavit, (ECF No. 83-2, Ex. G), does not contradict his deposition testimony,

(ECF No. 98-1 [Kolli Dep., Sept. 9, 2016]), because plaintiff's counsel simply did not ask

questions with respect to the information contained in the affidavit, and therefore, it is not properly

cast as a sham affidavit.  (ECF Nos. 98 ¶¶ 4-5).  The court must now determine whether the

affidavit is appropriately considered for purposes of summary judgment.

Federal Rule of Civil Procedure 56(c) permits the use of affidavits in summary judgment

proceedings.  "An affidavit or declaration used to support or oppose a motion must be made on

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Summary

judgment requires the court to analyze the evidence in the light most favorable to the nonmoving

party; however, the nonmoving party must be able to point to particular record evidence showing

that there is a genuine dispute of material fact.  Fed. R. Civ. P. 56(e); *see Liberty Lobby*, 477 U.S. at 247-48; *Celotex*, 477 U.S. at 323-25.

The "sham affidavit" doctrine refers to the trial courts' "practice of disregarding an offsetting affidavit that is submitted ***in opposition to a motion for summary judgment*** when the affidavit contradicts the affiant's prior deposition testimony."  *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (emphasis added) (citing *Shelcusky v. Garjulio,* 797 A.2d 138, 144 (N.J. 2002)).  In essence, parties are not permitted to file an affidavit in an effort after the fact to manufacture a material issue to defeat summary judgment.  *Baer*, 392 F.3d at 624 (citing *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir. 1991)).  Nevertheless, even if an affidavit is in some ways seemingly contradictory, it is not necessarily a "sham."  *Baer*, 392 F.3d at 625.  "When there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit" offered to defeat summary judgment.  *Baer,* 392 F.3d at 624; *Hackman,* 932 F.2d at 241; *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 705-06 (3d Cir. 1988).

Ordinarily, if faced with an argument that a party has interposed a sham affidavit, the court must determine whether the affidavit contradicts the affiant's prior deposition testimony or creates a genuine issue of material fact.  Notably, the doctrine applies ***where an affidavit is offered by the nonmovant to defeat*** a motion for summary judgment.  *Daubert v. NRA Group, LLC*, 861 F.3d 382, 392 (3d Cir. 2017) (citing *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007); *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006); *Martin*, 851 F.2d at 705.  The court will grant a motion for summary judgment if there is no genuine dispute of a material fact, Fed. R. Civ. P. 56(a), and the nonmoving party may not file an affidavit in an effort to manufacture a genuine issue of material fact in order to overcome a properly supported summary judgment motion.  *See Baer,* 392 F.3d at 624; *Hackman,* 932 F.2d at 241.

The reason the sham affidavit doctrine is inapplicable to an affidavit filed **in support of** a summary judgment motion, such as here, is quite evident in considering the summary judgment standard. If there is evidence in the record in conflict with the affidavit proffered by a defendant in support of summary judgment, then, under the summary judgment standard, the plaintiff may simply point to that evidence, the court views the evidence in the light most favorable to the nonmoving party, and the affidavit offered in support of summary judgment is essentially of no effect because there would be a genuine issue of fact. Therefore, the summary judgment standard obviates the need for the sham affidavit doctrine where the party interposing the affidavit is the movant.

The Court of Appeals for the Third Circuit has taken a discretionary approach to determining the consideration of affidavits for the purposes of summary judgment.[6] *See EBC, Inc. v. Clark Building Sys., Inc*. 618 F.3d 253, 268 (3d Cir. 2010). Under the sham affidavit doctrine, courts may disregard affidavits submitted to oppose summary judgment that contradict the affiant's prior testimony – that is "when the 'affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the later contradiction.'" *Daubert*, 861 F.3d at 392 (quoting *Martin*, 851 F.2d at 706). Courts "may similarly disregard an affidavit 'entirely unsupported by the record and directly contrary to [other relevant] testimony,' *Jiminez*, 503 F.3d at 254, or if it's 'clear' the affidavit was offered 'solely **to defeat summary judgment**, *id.* at 253." *Daubert,* 861 F.3d at 392 (emphasis added)) (citing *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006), and *Martin*, 851 F.2d at 705).

---

[6] "We therefore hold that when reviewing a motion for summary judgment, a district court does not abuse its discretion under Rule 30(e) [of the Federal Rules of Civil Procedure] when it refuses to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification. At the same time, we emphasize that courts may, in their discretion, choose to allow contradictory changes (and implement the remedial measures discussed above) as the circumstances may warrant." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 268 (3d Cir. 2010).

Even assuming the sham affidavit doctrine could apply to an affidavit submitted by the movant, the court determines it is not applicable here. Plaintiff contends that Dr. Kolli never testified to the contents of the affidavit, plaintiff's counsel somehow did not have the opportunity to examine Dr. Kolli on those issues, and, therefore, the affidavit should be excluded from consideration. (ECF No. 94 ¶¶ 4A-4C). In support, plaintiff cites Federal Rule of Civil Procedure 30(e), which requires parties to submit a statement of changes within 30 days after notice that the transcript is available in order to alter the substance or form of deposition testimony. Fed. R. Civ. P. 30(e). (ECF No. 94 ¶ 3). Defendant responds, quite expectedly, that Dr. Kolli: (1) is not contradicting his prior testimony; (2) could not have utilized a statement of changes with respect to issues about which he was not questioned; and (3) is not precluded from providing an affidavit to support his motion for summary judgment. (ECF No. 98 ¶¶ 4-6). There is no evidence pointed to by plaintiff to support that plaintiff was prevented, hampered, or obstructed, in any way, from seeking evidence in discovery with respect to the matters addressed in Dr. Kolli's affidavit from Dr. Kolli at his deposition or from elsewhere.

Most importantly, plaintiff fails to identify specific testimony by Dr. Kolli that would contradict any of the assertions made by him in his affidavit. Indeed, plaintiff consistently argues that Dr. Kolli never testified to the issues presented in the affidavit. (ECF No. 94 ¶¶ 4A-4C). If, however, Dr. Kolli never testified to the issues in the affidavit, as plaintiff contends, then there cannot possibly be any contradiction between Dr. Kolli's deposition testimony and his affidavit;[7] rather, the affidavit merely supplements Dr. Kolli's defense, as defendant suggests. (ECF No. 98).

---

[7] Under plaintiff's approach, if Dr. Kolli had never been deposed, Dr. Kolli would be prevented from proffering *any* affidavit in support of summary judgment because he would not have been called to testify at a deposition as to *any* matter. This reasoning is unsupported and specious.

Additionally, what plaintiff claims are facts set forth in Dr. Kolli's affidavit that contradict Dr. Kolli's deposition testimony are ultimately immaterial to the motion for summary judgment. For example, as indicated in his affidavit, Dr. Kolli maintains that he performed a suicide risk assessment on Mr. Kempf on January 8, 2015. (Kolli Aff. ¶ 3). Plaintiff, citing generally to Dr. Kolli's deposition, argues that Dr. Kolli testified that he did not perform a suicide risk assessment on Mr. Kempf. (ECF No. 94 ¶ 5). With respect to a suicide rating system, however, Dr. Kolli specifically testified: "I do not use any specific grading system but just general interview and talking to the patient and staff." (Kolli Dep. 48:2-4). Defendant explains that Dr. Kolli was never asked at his deposition whether he completed *any* type of suicide risk assessment of Mr. Kempf. (ECF No. 98 ¶ 5). Indeed, while the record does not contain a document itself entitled "suicide risk assessment" that was completed by Dr. Kolli, there is a document entitled "physician assessment" of Mr. Kempf completed by him on January 8, 2015. (ECF No. 83-2 [Southwestern Pennsylvania Human Services, Inc. Behavioral Health Physician Assessment]). Under the "mental status exam" section, Dr. Kolli's physician assessment indicates that Mr. Kempf did not express suicide ideation to Dr. Kolli at the time he performed his assessment. *Id.* Therefore, Dr. Kolli's assessment of Mr. Kempf on January 8, 2015 included matters related to suicide, which indicates that Dr. Kolli performed some kind of suicide assessment.

Whether the assessment performed by Dr. Kolli amounts to any specific suicide risk assessment or a suicide risk assessment that deviated from the standard of care is addressed in determining whether Dr. Kolli is entitled to summary judgment under the deliberate indifference standard applicable for the § 1983 claim as will be discussed more fully below. Plaintiff did not identify any specific contradictions between the affidavit and deposition testimony or that the affidavit is not supported by the record. Therefore, the affidavit is properly considered in support

of Dr. Kolli's motion for summary judgment – but as required under Federal Rule 56 of Civil Procedure, the affidavit and all the evidence of record, including Dr. Kolli's deposition, will be viewed by the court in the light most favorable to plaintiff. Accordingly, the motion to strike will be denied.

## V. FACTUAL BACKGROUND[8]

### A. Decedent's Mental Health Prior to Detention

Mr. Kempf was hospitalized at the Washington Hospital (hereinafter, the "hospital") from December 30, 2014 through January 2, 2015, and was diagnosed with major depressive disorder and opiate dependence. (CCSMF ¶¶ 7, 10). Mr. Kempf's chief complaint on December 30, 2014, upon admission to the hospital was that he was "suicidal with plans to shoot up on drugs to kill himself." (CCSMF ¶ 7). No suicide attempt, however, was made at this time or noted in the hospital records. (CCSMF ¶ 8). At the time of his discharge on January 2, 2015, Mr. Kempf denied suicidal or homicidal ideation and denied psychotic symptoms. (CCSMF ¶ 9). (ECF No. 83-2, Ex. A [Discharge pages from The Washington Hospital hospitalization]). Upon discharge, Mr. Kempf was prescribed Thorazine and Celexa.[9] (CCSMF ¶¶ 7, 10). He "was given a two weeks supply of the medication and the drug Thorazine was prescribed in a double daily dose." (CCSMF ¶ 10). Mr. Kempf was "feeling okay" at discharge, but withdrawing from drugs. (CCSMF ¶ 11). Following his discharge he failed to take the prescribed medications and

---

[8] The factual background is taken from the undisputed evidence of record, including the parties' Combined Concise Statement of Material Facts (CCSMF), which contains defendant's concise statement of material facts combined with plaintiff's responses and additions, and defendant's responses (ECF No. 107); evidence not properly disputed on the record; and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Liberty Lobby, Inc.,* 477 U.S. at 255.

[9] Dr. Kolli asserts that prior to the decedent's arrest, Mr. Kempf was diagnosed with major depressive disorder and opiate dependence and was prescribed Thorazine and Celexa. (CCSMF ¶10). Plaintiff adds to statement of fact ¶10 and in response simply provides further detail with respect to the precise dosage.

immediately relapsed on heroin.[10]  (CCSMF ¶¶ 12, 22).  Just four days after discharge, on January

6, 2015, Mr. Kempf was arrested, charged with burglary, theft, and receiving stolen property, and

detained.  (CCSMF ¶ 13).

### B.  Mental Health Evaluations at Washington County Corrections Facility

Upon his arrest, Mr. Kempf was taken to the Washington County Correctional Facility

(hereinafter "WCCF"), where a "Suicide Prevention Screening Questionnaire" dated January 6,

2015, and a "Health Care Screening Form" dated January 7, 2015, were completed by WCCF staff.

(CCSMF ¶ 14, 15).  These documents reflect Mr. Kempf's history of heroin abuse and his recent

hospitalization for drugs and depression, with respect to which he was discharged four days prior

to being detained.  (CCSMF ¶ 16).  While the "Health Care Screening Form" indicates that he

denied attempting suicide, the "Suicide Prevention Screening Questionnaire" explicitly states that

Mr. Kempf had made a previous suicide attempt and assessed Mr. Kempf as a "High" suicide

risk.[11]  (CCSMF ¶¶ 17, 18).  (ECF No. 83-2, Ex. C [Suicide Prevention Screening Questionnaire]).

---

[10] Citing to the Washington Hospital Records and Dr. Kolli's deposition, defendant claims that Mr. Kempf was feeling okay and withdrawing from drugs at the time he was discharged from the hospital.  (CCSMF ¶11).  (ECF No. 83-2 [Southwestern Pennsylvania Human Services, Inc. Behavioral Health Physician Assessment]).  (Kolli Dep. 36:1-2).  Plaintiff indicates that this fact is disputed and claims that defendant's citations clearly state that Mr. Kempf relapsed.  Defendant points out that plaintiff fails to cite to the record; however, with respect to his physician assessment, Dr. Kolli testified that Mr. Kempf "was discharged, DC, as he was feeling okay. He was withdrawing from drugs. He relapsed on heroin after his discharged from the hospital." (Kolli Dep. 35:25-36:3).  The evidence adequately supports defendant's factual assessment on this point.

[11] The Suicide Screening Questionnaire rates Mr. Kempf as a "Level II High" risk, but the policy itself states:

> Level I precautions shall apply to any inmate who attempts or has recently attempted suicide or is considered to be at a very high risk of suicide. . . . Level II precautions shall apply to an inmate that the Physician, Nurse or Mental Health consultant believe are at a moderate risk for suicide. . . . Level III precautions shall apply to inmates who are at high risk for *becoming severely depressed or suicidal*.

(ECF No. 98-1 at 71) (emphasis added).  Additionally, housing for Level II inmates is assigned, based on availability, in the following order: (1) suicide risk cell; (2) detoxification cell; and (3) consulting the Deputy Warden if suicide risk cells or detoxification cells are unavailable.  *Id.*  Based upon the "Suicide Prevention Screening Questionnaire" and the WCCF Suicide Prevention Policy, Mr. Kempf was rated a Level II and was placed on suicide watch. (ECF No. 98-1 at 63).

On January 7, 2015, WCCF Nurse Katie Moss also noted that Mr. Kempf admitted to using up to 15 bags of heroin per day and he last used heroin on January 5, 2015 – the day before his detention. (ECF No. 107 [PCSMF ¶ 10]).

WCCF did not receive Mr. Kempf's medical records from the hospital within the first two days of Mr. Kempf's detention (CCSMF ¶ 20), and there is no evidence that they were ever requested or received by Dr. Kolli.[12] Dr. Kolli and WCCF staff were fully aware of Mr. Kempf's recent hospitalization, treatment for major depression and suicidal feelings, opioid dependence diagnosis and use just prior to detention, history of major depressive disorder, and recent Thorazine and Celexa prescriptions that he did not take. (CCSMF ¶ 22). Due to his known history, upon his arrival at WCCF, the nursing staff immediately placed Mr. Kempf on suicide watch *and* required him to be monitored for drug withdrawal; the suicide watch and monitoring, however, only occurred for two days, because at that time Dr. Kolli removed him from them. (CCSMF ¶ 23).[13] Viewing the evidentiary record in the light most favorable to plaintiff, Mr. Kempf was removed from suicide watch despite knowledge of his recent hospitalization for suicide ideation and his drug withdrawal.

### C. Evaluation and Assessment by Dr. Kolli

---

[12] Plaintiff disputes this fact, stating that the medical records were never received or ever requested by Dr. Kolli, citing to (ECF No. 102, Ex. 1 [Washington Hospital Kempf Emergency Room Records], Ex. 2 [Washington Hospital Kempf Discharge Summary], and Ex. 4 [New Directions Rehab. Kempf Treatment Notes]). It is unclear whether the medical records were ever requested or ever received by Dr. Kolli. Defendant cites to his deposition, which expressly states that the records were not present within the first two days of Mr. Kempf's detention at WCCF. (Kolli Dep. 28:2-7). Therefore, CCSMF ¶ 20 is supported by the record; however, an inference supported by the record also can be made that the records were never received, requested or reviewed by Dr. Kolli. Indeed, Dr. Kolli clarifies he has not maintained that he ever obtained the records. (ECF No. 107 at 5).

[13] It is not disputed that Mr. Kempf was placed on suicide watch upon his arrival at WCCF. Indeed, defendant, citing to the record, states that Mr. Kempf was monitored for drug withdrawal by nursing staff while he was on suicide watch. (CCSMF ¶23). (ECF No. 83-2 [Southwestern Pennsylvania Human Services, Inc. Behavioral Health Physician Assessment]; Kolli Dep. 28:23-24, 35:11-12). Plaintiff adds that Mr. Kempf's recent hospitalization for suicidal ideation was the reason he was placed on suicide watch. (ECF No. 102, Ex. 8 [Washington Cty. Jail Suicide Investigation – Kempf]). Dr. Kolli admits in his deposition that: "when I asked him why you were placed on suicide watch he said, I was in the hospital a week ago. That's why they put me on suicide watch." (Kolli Dep. 35:17-20).

Since 2008, Dr. Kolli has provided four hours per week of psychiatric care to detainees at WCCF as an employee of Southwest. (CCSMF ¶¶ 26-27). Nurses at WCCF provided Dr. Kolli with a list of patients who had been triaged by the nursing staff to be seen by him. (CCSMF ¶ 28).

On January 8, 2015, two days after Mr. Kempf arrived at WCCF, he was examined by Dr. Kolli. (CCSMF ¶ 24). Plaintiff contends, citing to Dr. Kolli's deposition, that Dr. Kolli did not review either the Suicide Prevention Screening Questionnaire or the Health Care Screening Form conducted by jail and jail medical staff when assessing Mr. Kempf. (ECF No. 95 at 3). Dr. Kolli testified that he could not specifically recall if he saw the Suicide Prevention Questionnaire prior to seeing Mr. Kempf, but that it was "most likely" that he "saw" the Health Care Screening Form. (ECF No. 98-1 at 20; Kolli Dep. 20:2-4; 23:24-24:2). As indicated by the physician assessment, Mr. Kempf did tell Dr. Kolli that he had been recently hospitalized. (Kolli Dep. 35:10-38:3). In Dr. Kolli's physician assessment notes, he noted that Mr. Kempf was "feeling okay" but that he also was "withdrawing from drugs when he was discharged" from the hospital on January 2, 2015 (CCSMF ¶ 22). During his deposition, however, Dr. Kolli read his physician assessment of Mr. Kempf, (ECF No. 102, Ex. 3 at 16 [Dr. Kolli Consult Notes]), into the record:

> He was in psyche unit at [sic] with suicidal feelings, but he was discharged . . . as he was feeling okay. He was withdrawing from drugs. He relapsed on his heroin after his discharge from the hospital. He was not taking any medications after his discharge. He denies any suicidal ideas. He denies any psychotic symptoms.

(Kolli Dep. 35:24-36:6]). For the purpose of summary judgment, viewing the record in the light most favorable to plaintiff, the nonmoving party, the court must consider that Dr. Kolli did not review the Health Care Screening Form or the Suicide Prevention Screening Questionnaire. Mr. Kempf told Dr. Kolli about his prior hospitalization and recent feelings of suicide[14] and at the time of Dr. Kolli's exam Mr. Kempf was on suicide watch. (CCSMF ¶¶ 23, 42).

---

[14] Plaintiff's contention with this fact is not supported by the record. Therefore, CCSMF ¶ 22 is admitted.

Dr. Kolli had never seen, reviewed, or considered the Washington County Jail Suicide Prevention Policy or Procedure and he did not utilize jail suicide prevention policy or procedure assessment levels for suicide detainees, such as the "High" suicide rating given to Mr. Kempf on the "Suicide Screening Questionnaire." (Kolli Dep. 46:17–48:15). The suicide prevent policy assessment levels indicate the precautions to be applied to detainees, including housing considerations. (ECF No. 102 at 157-160). Dr. Kolli conducted his own assessment of Mr. Kempf. (ECF No. 83-2 [Southwestern Pennsylvania Human Services, Inc. Behavioral Health Physician Assessment]). Under the "Mental Status Exam" portion of Dr. Kolli's physician assessment of Mr. Kempf completed on January 8, 2015, Dr. Kolli noted that Mr. Kempf's mood was "anxious," but under "SI" (suicidal ideations), he wrote "none." *Id.* According to Dr. Kolli, although Mr. Kempf seemed anxious and had just been hospitalized in a psyche unit with suicidal feelings, Mr. Kempf, at the time of Dr. Kolli's examination, denied suicidal ideas or psychotic symptoms and, upon assessment, was cooperative and "normal." (CCSMF ¶¶ 35-37).

Dr. Kolli noted Mr. Kempf's recent history of major depressive disorder and opioid dependence, and ordered Celexa, "an antidepressant and an antianxiety type of medication classified as SSRI, selective serotonin reuptake inhibitor" (Kolli Dep. 33:9-11), and Thorazine, an antipsychotic drug that is also used for sleep, anxiety and mood swings, (Kolli Dep. 33:16-18; CCSMF ¶¶ 38-39, 42), but his testimony and physician assessment reveal no screenings or treatment for the opioid dependence and withdrawal. (ECF Nos. 83-2 at 11-14, 18-30; 102 at 20, 95-144). Dr. Kolli removed Mr. Kempf from suicide watch without obtaining records from Mr. Kempf's hospitalization for suicidal ideation and drug withdrawal, scheduled a follow-up appointment with Mr. Kempf for twelve weeks later with no requirement for earlier review or medical management with respect to his medication or conditions. (CCSMF ¶¶ 42, 45) (Kolli Dep.

33:21–34:1). Dr. Kolli informed Mr. Kempf that he could schedule an appointment sooner if necessary.[15] (Kolli Aff. ¶ 7).

### D. Events of Decedent's Detention

#### 1. Confinement

For about three of the weeks in January and February 2015, while Mr. Kempf was at WCCF,[16] he was detained with David Greene (hereinafter "Mr. Greene") with whom he had been friends for approximately four years. (CCSMF ¶¶ 58-60). When Mr. Green first saw Mr. Kempf at WCCF, Mr. Green noticed that Mr. Kempf was pale-looking, sweaty, and sick from withdrawal, but otherwise appeared to him to be fine. (CCSMF ¶¶ 48, 61).

On January 24, 2015, Mr. Kempf was placed in confinement status "P/C"[17] by Captain Fletcher, due to harassment by other inmates; however, the harassment continued through the cell

---

[15] The only evidence of Mr. Kempf discussing or seeking additional medical treatment is an undated and undirected letter by Mr. Kempf expressing that he desired drug rehabilitation treatment. (ECF No. 102, Ex. 6 [Kempf Letter Re Seeking Drug Treatment Assistance]). According to the amended complaint, on January 20, 2015, Mr. Kempf attended his preliminary hearing with magisterial District Judge Robert Redlinger. (ECF No. 50 ¶16). During the proceeding, Mr. Kempf sought treatment assistance for drug or substance dependency and withdrawal. *Id.* Mr. Greene, with whom Mr. Kempf had been a pretrial detainee at WCCF, testified:

> Mr. Redlinger the district justice told him if he could get into treatment, then he would release him until his sentencing to go to treatment, and he asked me how you go about that, and I told him either, A, you know, write the counselor at the jail, but write like drug and alcohol, the drug and alcohol commission, tell them, you know, everything, and as far as I know, he wrote a couple letters and sent them out and . . . I didn't ever see him get like any . . . response to those letters.

(ECF No. 102, Ex. 13 [Greene Dep. 20:12-22, Feb. 7, 2017]). Mr. Greene testified that he advised Mr. Kempf to consult the counselor at the jail, but there is no evidence to support that Mr. Kempf ever did. *Id.* at 21:9-12). With respect to whom Mr. Kempf sent letters, Mr. Greene testified: "I know he wrote his girlfriend a letter, and I'm pretty sure he wrote his dad, but I didn't – I didn't see him write like the letters that I had told him about, like the PD and the drug and alcohol commission or anything like that. I didn't personally see him write those letters." *Id.* at 22:12-17). When asked if Mr. Kempf ever mentioned that he wrote letters to counselors or a counseling service, Mr. Greene responded: "He said I did what you told me to do." *Id.* at 23:8-9). Mr. Greene, however, did not see the letter seeking treatment. *Id.* at 23:14-22.

[16] Mr. Greene testified that he thought Mr. Kempf and he shared a cell from about January 6 through January 25, 2015. (Greene Dep. 11:3-6).

[17] Neither party defined "PHC" status or "P/C" status. Mr. Kempf was moved to P/C in order to be protected from aggressors, (ECF No. 102, Ex. 8 [Washington Cty. Jail Suicide Investigation – Kempf]), but the P/C cell door had a window and other inmates harassed Mr. Kempf through that window. *Id.* From this evidence, viewed in the light

door window in P/C. (ECF No. 102, Ex. 8 [Washington Cty. Jail Suicide Investigation – Kempf]).

Captain Fletcher moved Mr. Kempf to a different cell to prevent the harassment from continuing.

*Id.* On January 25, 2015, Captain Fletcher moved Mr. Kempf to a "lower classification" so that

he could have a "fresh start." *Id.* Captain Fletcher noted:

> While on this housing unit I was told by my officer that [Mr. Kempf] received back
> to back write-ups and was placed on PHC status . . . . Not long after completing his
> PHC confinement, he was caught by the unit officer standing in front of another
> inmate's cell who was on PHC status talking to him. He was again placed on PHC
> . . . . He was housed in this cell until his unfortunate demise.

*Id.*

According to Dr. Kolli, he is not part of the housing and disciplinary processes at WCCF,

had not been informed that Mr. Kempf was placed in a more restrictive kind of confinement, and

did not consult with WCCF staff with respect to effects of more restrictive confinement on Mr.

Kempf's health concerns. (Kolli Dep. 46:1-11; Kolli Aff. ¶ 8]).

### 2. *Death of Mr. Kempf*

Approximately three weeks after Dr. Kolli removed Mr. Kempf from suicide watch, Mr.

Kempf was found hanging in his cell while on PHC status on February 2, 2015. (CCSMF ¶ 83).

The City of Washington Police Department determined that Mr. Kempf died by self-induced

asphyxiation by hanging, and his death was ruled a suicide. (CCSMF ¶ 84).

Although Mr. Kempf and his fiancé communicated regularly *via* letters throughout the

course of his pre-trial detention, when she learned of his death, she expressed that she was surprised

and did not believe he committed suicide. (CCSMF ¶¶ 78-79). When Mr. Greene learned Mr.

Kempf had committed suicide, he was "shocked," as Mr. Kempf never indicated to Mr. Greene

---

most favorable to the nonmovant, it appears that Mr. Kempf was placed in something approaching a form of solitary
confinement, which was more restrictive than the general population. Additionally, Mr. Kempf was moved to PHC
status when he committed an infraction. *Id.*

that he was considering or planning to commit suicide. (CCSMF ¶¶ 65, 68). Additionally, Mr. Kempf did not indicate to his father that he was suicidal or needed mental health treatment. (CCSMF ¶¶ 75, 77). Although close with her brother, Amanda Kempf was not aware of Mr. Kempf experiencing any mental health issues, and he never told her that he suffered from depression. (CCSMF ¶¶ 2, 4). During a 45-minute conversation on January 20, 2015, two weeks prior to his death, Mr. Kempf did not mention to his sister that he was suicidal, did not discuss any suicide attempts, and did not report to her any health concerns. (CCSMF ¶ 71). At that time, however, Mr. Kempf appeared to his sister to be going through withdrawal and acted "like he didn't feel good," but he did not report any health concerns to her. (CCSMF ¶ 73).

### E. Expert Opinions

As permitted by Federal Rule of Evidence 702, both parties provided medical expert reports during the course of discovery in order to clarify medical issues. Fed. R. Evid. 702.

#### 1. Opinions of Defense Expert, Dr. Joseph Penn, M.D.[18]

On May 4, 2017, Dr. Joseph Penn, M.D. (hereinafter "Dr. Penn") submitted a medical expert opinion on behalf of Dr. Kolli. Dr. Penn is a licensed physician and board certified psychiatrist in the State of Texas and works as the Director of Mental Health Services in the Correctional Managed Care Division of the University of Texas Medical Branch. (ECF No. 83-2, Ex. K [Expert report of Joseph Penn, M.D., dated May 4, 2017]). Dr. Penn has produced publications and presentations with respect to correctional mental health care and suicide prevention. *Id*. at 1-6. In direct conflict with the opinion of plaintiff's expert discussed below, Dr.

---

[18] Plaintiff and defendant respectively dispute conclusions made by both Dr. Penn and Dr. Daniel on the basis that the medical experts disagree with each other and assert that the medical expert reports speak for themselves. (CCSMF ¶¶ 88, 94, 95, 97, 98). Because this appears to be a "battle of the experts," the court must view the evidence in the light most favorable to plaintiff for purposes of summary judgment and any conflict is resolved in favor of plaintiff. The Court of Appeals for the Third Circuit, however, has found that if the difference between conflicting expert reports is a question that can be decided as a matter of law, then the court may grant summary judgment. *See Stagi v. National R.R. Passenger Corp.*, 391 F. App'x 133, 143, 147 (3d Cir. 2010).

Penn opines that Dr. Kolli acted within the standard of care and was not deliberately indifferent to Mr. Kempf's medical needs. *Id*. at 19.

After reviewing the relevant case records, Dr. Penn concludes that there is no evidence to indicate that Mr. Kempf had communicated an intent or plan of suicide or suicide ideation to Dr. Kolli. *Id*. at 11. Dr. Penn explains that Mr. Kempf did not demonstrate any signs or symptoms of imminent risks of self-harm or suicide. *Id*. at 12. "Due to a lack of verbalized plans to harm himself, and his frank denial of any suicidal ideation during the psychiatric evaluation performed by Dr. Kolli on January 8, 2015, there was no reason for Dr. Kolli to continue Mr. Kempf on suicide precautions. There was no clinical indication to place any restrictions on Mr. Kempf." *Id*. at 11. Dr. Penn opines that Mr. Kempf's suicide was unpredictable and unpreventable, offering that symptoms of depression commonly occur with substance intoxication and substance withdrawal. *Id.* at 13, 19. Dr. Penn notes that Dr. Kolli prescribed two psychotropic medications and scheduled a twelve-week follow-up evaluation, which, according to Dr. Penn, demonstrates that Dr. Kolli did not disregard Mr. Kempf's medical needs, *Id.* at 15, or at least some of his medical needs. According to Dr. Penn, the twelve-week follow-up is consistent with the correctional psychiatric standard of care, as the standard allows for follow-up appointments for psychiatric evaluations in general to be variable – anywhere from 1-6 months.[19] *Id.* at 16. He did not opine, however, what the follow-up should be for someone, such as Mr. Kempf, with major depressive disorder, heroin withdrawal, and a very recent hospitalization for suicide issues. *Id.*

---

[19] Dr. Penn opined that: "It is within the accepted community and correctional psychiatric standard of care for a psychiatrist to schedule a follow-up psychiatric evaluation at a variable period, anywhere from 1-6 months. This is an accepted practice within jail and prison settings." (ECF No. 83-2 [Expert report of Joseph Penn, M.D., dated May 4, 2017]). Plaintiff's expert, however, opined based on his experience and with respect to Mr. Kempf specifically, that "such a late follow-up is not consistent with the standard of care particularly for an inmate with a history of mental illness, opioid withdrawal, psychotropic medication prescription and a recent history of suicide attempt." (ECF No. 83-2 [Expert report of A. E. Daniel, M.D., dated April 12, 2017] ¶6). Plaintiff's evidence is sufficient to create a material issue of fact on this point for summary judgment.

Dr. Penn commented that keeping individuals "with a remote history (*and no current* or *established imminent risk*) of suicide threats or attempts" on suicide watch may impede the individual's treatment and clinical progress. *Id*. at 15 (emphasis added). "The professional standard for care of persons with mental illness is 'the least restrictive means necessary.'" *Id.* at 15. He opined that it is unreasonable to expect jail or prison psychiatrists *routinely* to request any or all past medical records or to have immediate access to them. *Id*. at 16 (emphasis added).

2. *Opinion of Plaintiff's Expert Witness, Dr. A.E. Daniel, M.D.*

Dr. A.E. Daniel, M.D. (hereinafter "Dr. Daniel") submitted his "Professional Opinions and Conclusions," dated April 12, 2017, on behalf of plaintiff. (ECF No. 83-2, Ex. L [Expert report of A. E. Daniel, M.D., dated April 12, 2017]). As a licensed and board certified psychiatrist in the State of Missouri, Dr. Daniel has written articles and conducted seminars specifically with respect to suicide prevention in jails and prisons. *Id*.

After reviewing the relevant case records, Dr. Daniel opined that Mr. Kempf had a high suicide risk throughout his detention at WCCF, explaining that: (1) Mr. Kempf had major depressive disorder and opioid dependence; (2) Mr. Kempf's risk of self-harm increased when he was placed in PHC status; and (3) Dr. Kolli's failure to assess adequately Mr. Kempf's suicide risk not only was a deviation from the standard of care, but also was "a gross disregard of his serious medical need," as Mr. Kempf's Screening Questionnaire itself indicated that he was at least a Level II moderate suicide risk,[20] *id. ¶¶* 2-4; though admittedly a "high" risk by Dr. Kolli. (Kolli Dep. 20:8-12).

---

[20] In his report, plaintiff's medical expert, Dr. Daniel, classifies Mr. Kempf as a Level II moderate risk (per the questionnaire). (ECF No. 83-2 [Expert report of A. E. Daniel, M.D., dated April 12, 2017] ¶3). However, the Suicide Prevention Screening Questionnaire says "Level II High." (ECF No. 83-2 [Suicide Prevention Screening Questionnaire]. The WCCF Suicide Prevention Policy considers Level II to be a moderate suicide risk and Level I to be a high suicide risk. (ECF No. 98-1).

Dr. Daniel opines that: (1) given Mr. Kempf's condition, including his risk of suicide and his drug withdrawal, a twelve-week follow-up was inconsistent with the standard of care; (2) Dr. Kolli's failure to obtain and utilize hospital records and to review the Suicide Screening Questionnaire is inconsistent with standard clinical practice; and (3) "Dr. Kolli's failure to take adequate and appropriate steps to provide substance abuse treatment for Mr. Kempf" demonstrates deliberate indifference to Mr. Kempf's serious medical needs. *Id*. ¶¶ 5-8. Dr. Daniel explains that Mr. Kempf's history of opioid abuse, recent hospitalization, and anxious demeanor during Dr. Kolli's assessment indicate that Mr. Kempf was suffering from opiate withdrawal. *Id*. ¶ 9. Dr. Daniel opines that these factors necessitate a urine drug screen and drug detox. *Id*. Dr. Daniel concludes, based upon those considerations, that Dr. Kolli not only deviated from the standard of care, but substantially deviated and acted deliberately indifferent to Mr. Kempf's psychiatric and medical needs, and directly and "proximately caused" Mr. Kempf's suicide. *Id.* ¶ 11.

## VI. <u>DISCUSSION</u>

Plaintiff alleges that Dr. Kolli denied Mr. Kempf's Fourteenth Amendment right to adequate medical care and that Dr. Kolli's deliberate indifference to Mr. Kempf's serious medical needs resulted in Mr. Kempf's suicide. (ECF No. 50, ¶¶ 82, 95). Dr. Kolli argues that he did not violate Mr. Kempf's Fourteenth Amendment due process rights, because the evidence is insufficient to show that Mr. Kempf possessed a particular vulnerability to suicide or that Dr. Kolli acted with deliberate indifference toward that particular vulnerability. *Id.*

"To state a claim under § 1983, a plaintiff 'must allege both a deprivation of a federally protected right and that this deprivation was committed by one acting under color of state law.'" *Woloszyn v. Cty. of Lawrence*, 396, F.3d 314, 319 (3d Cir. 2001) (citing *Lake v. Arnold,* 112

F.3d 682, 689 (3d Cir. 1997)). "The Supreme Court has specifically held that psychiatrists under contract with the State to provide medical care in correctional facilities can be state actors for the purposes of § 1983." *Ponzini v. Monroe Cty.* No. 3:11-CV-00413, 2015 WL 5123680 at *4 (M.D. Pa. Aug. 31, 2015) (citing *West v. Atkins*, 487 U.S. 42, 55-56 (1988)).

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that the Eighth Amendment requires the government to provide medical care to incarcerated individuals and concluded that deliberate indifference to a prisoner's serious medical needs violates the prisoner's constitutional rights. 429 U.S. at 103-04. "The Due Process Clause of the Fourteenth Amendment provides pre-trial detainees at least as much protection for personal security as the level guaranteed to prisoners by the Eighth Amendment." *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) (citing *Colburn v. Upper Darby Twp.,* 838 F.2d 663, 668 (3d Cir. 1988) ("*Colburn I*"), *overruled in part on other grounds*, *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993)). Therefore, the deliberate indifference standard for inadequate medical care applicable under the Eighth Amendment to incarcerated individuals also applies to pre-trial detainees. *Natale v. Camden Cty. Correctional Facility*, 318 F.3d 575, 581 (3d Cir. 2003).

"The Third Circuit has clearly held that, under the appropriate circumstances, a pretrial detainee's suicide can give rise to a Section 1983 violation as an infringement of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Plasko v. City of Pottsville*, 852 F. Supp. 1258 (E.D. Pa. 1994); *see Simmons v. City of Phila.,* 947 F.2d 1042, 1067 (3d Cir.1991); *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1023 (3d Cir.1991) ("*Colburn II* "); *Williams,* 891 F.2d at 464; *Freedman v. City of Allentown,* 853 F.2d 1111, 1115 (3d Cir.1988); *Colburn I,* 838 F.2d at 667-70.

"[T]o survive summary judgment, [plaintiff] must come forward with evidence from which it can be inferred that the defendant-[official was] . . . *knowingly* and *unreasonably* disregarding an objectively intolerable risk of harm." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994) (emphasis added). In order for plaintiff to succeed on a § 1983 claim in the context of a detention suicide, plaintiff must prove the following elements:

> (1) that the individual had a particular vulnerability to suicide, meaning that there was a 'strong likelihood, rather than a mere possibility,' that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

*Palakovic*, 854 F.3d at 223-24; *see Tatsch-Corbin v. Feathers,* 561 F. Supp. 2d. 538, 543-44 (W.D. Pa. 2008) (quoting *Colburn II,* 946 F.2d at 1023).

Because the court must enter summary judgment against a party who fails to present evidence sufficient to establish an essential element of the case, the court must determine whether the evidentiary record could support a finding that Mr. Kempf exhibited a particular vulnerability to suicide and that Dr. Kolli acted with deliberate indifference to Mr. Kempf's serious medical need. Fed. R. Civ. P. 56; *see Celotex*, 477 U.S. at 322.

## A.  Consideration of Expert Reports

In the case at hand, both parties provided medical export reports during the course of discovery in order to clarify medical issues. The court must consider the role of medical expert testimony in the context of § 1983 deliberate indifference claims. In general, "[i]t is additional extrinsic proof [(e.g., a training manual, photograph, or medical records)], rather than an expert witness specifically, that [i]s required for [plaintiff] to survive summary judgment." *Pearson v. Prison Health Servs*., 850 F.3d 526, 536 (3d Cir. 2017).

The court in *Estate of Thomas v. Fayette County*. explained that

[e]xperts may be used to satisfy (or help satisfy) the initial burden [ ] on the party seeking summary judgment to point to the evidence which it believes demonstrate[s] the absence of a genuine issue of material fact. If the moving party carries this initial burden, then the nonmoving party may negate the expert reports by com[ing] forward with specific facts (rather than "some metaphysical doubt as to the material facts") that counter the moving party's arguments and show that there is a genuine issue for trial.[21]

*Estate of Thomas v. Fayette Cty.*, 194 F. Supp. 3d 358, 368 (W.D. Pa. 2016) (internal quotations and citations omitted); *see Matsushita*, 475 U.S. at 586-87; *see also United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011)); and *Deitrick v. Costa*, Civ. Act. No. 4:06-CV-01556, 2015 WL 1605700, at *4 (M.D. Pa. Apr. 9, 2015); c*ompare McCabe v. Prison Health Servs.,* 117 F. Supp. 2d 443, 452 (E.D. Pa. 1997) (holding medical expert testimony was not required for a valid § 1983 claim, but that expert testimony may be used to help the jury determine whether a serious medical need existed).

Medical expert testimony is properly considered for the purposes of summary judgment in the context of § 1983 deliberate indifference claims. Indeed, "[m]edical expert testimony *may be necessary* to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care." *Pearson*, 850 F.3d at 536 (emphasis added). Because the courts presume that the medical care provided to a prisoner was adequate absent evidence to the contrary, a prisoner should be permitted to offer medical expert testimony to defeat that presumption and to show that the medical official failed to exercise professional judgment. *Id*. Therefore, the expert report of Dr. Daniel, and the expert report of Dr. Penn to the extent it does not conflict with Dr.

---

[21] In *Estate of Thomas*, which involved the suicide of a detainee, only the defendants proffered expert evidence. *Estate of Thomas*, 194 F. Supp. 3d at 362. The court determined that the use of expert evidence was proper and met the defendants' initial burden on summary judgment, and that the plaintiff, as a nonmoving party, failed to point to evidence in the record, including any expert evidence in support, to create a material issue of fact with respect to the decedent's particular vulnerability to suicide or deliberate indifference. *Id*. at 363-64, 375. The only evidence plaintiff had with respect to Mr. Thomas' particular vulnerability to suicide was pointing to a textbook that suicide is a symptom of cocaine withdrawal. *Id*. at 375.

Daniel's report or other evidence, will be considered, in the light most favorable to plaintiff in determining whether plaintiff adduced sufficient evidence to survive summary judgment.

### B. Serious Medical Need: A Particular Vulnerability to Suicide

Defendant first argues that plaintiff cannot show that Mr. Kempf had a serious medical need. "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment **or** one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) (emphasis added) (citing *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987)). "A mental illness may constitute a serious medical need." *Goodrich v. Clinton Cty. Prison*, 214 F. App'x 105, 110-11 (3d Cir. 2007) (citing *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979)). The Court of Appeals for the Third Circuit has recognized that, in addition to major depressive disorder, "a 'particular vulnerability to suicide' is just one type of 'serious medical need,'" *Palakovic*, 854 F.3d at 222 (citing *Colburn II,* 946 F.2d at 1023), which in this case includes, but does not rest upon, Mr. Kempf's opioid dependence and withdrawal.

In order to overcome a motion for summary judgment, plaintiff must point to evidence that establishes that "the particular individual, not members of a demographic class to which the individual belongs, exhibits a particular vulnerability to suicide." *Estate of Thomas*, 194 F. Supp. 3d at 376 (citing *Wargo v. Schuylkill Cty.*, No. 3:06cv2156, 2008 WL 4922471 (M.D. Pa. Nov. 14, 2008), *aff'd*, 348 F. App'x 756 (3d Cir.2009)). For example, "many prison inmates are young men, many are in prison for serious offenses, and many suffer symptoms related to past drug abuse. Certainly it cannot be said that all of these individual inmates have a particularized vulnerability to committing suicide." *Wargo v. Schuylkill County*, 348 F. App'x 756, 759 (3d Cir. 2009)*.* "A

particular individual's vulnerability to suicide must be assessed based on the totality of the facts presented." *Palakovic,* 854 F.3d at 230.

In order to demonstrate that Mr. Kempf possessed a particular vulnerability to suicide, plaintiff must provide evidence from which a reasonable jury could find that there was a strong likelihood, rather than a mere possibility, that self-inflicted harm would occur. *Colburn II*, 946 F.2d at 1024. Defendant argues that, because Mr. Kempf's sister, father, and fellow detainee and friend, Mr. Green, were unaware that Mr. Kempf was at a risk of committing suicide, Mr. Kempf did not satisfy the layperson standard and thus did not possess a particular vulnerability to suicide. (ECF No. 84 at 5).

As the matter before the court does not involve non-medical jail officials, the "obvious to a layperson" standard if met would be sufficient, but is not required – Dr. Kolli, a medical doctor, clearly is not a non-medical lay prison official. *Atkinson*, 316 F.3d at 266 (plaintiff can meet by showing physician's understanding or lay person's understanding); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (considering medical personnel's substantial deviation from standard of care in determining deliberate indifference where matter not one obvious to a lay person). Defendant also contends that there is no evidence in the record to indicate that Dr. Kolli should have known that Mr. Kempf had a particular vulnerability to suicide. *Id*. at 7. Plaintiff, however, points to Mr. Kempf's recent hospitalization for suicide ideation to show that Mr. Kempf possessed a particular vulnerability to suicide. (ECF No. 95 at 17). Plaintiff explains that Mr. Kempf's vulnerability was recognized by the hospital staff when they treated Mr. Kempf for his opioid dependence and his suicide ideation during his hospital admission. *Id*. Mr. Kempf was diagnosed with major depressive disorder. Defendant counters plaintiff's assertions by arguing that Mr.

Kempf was in an improved condition at the time of his hospital discharge and that Mr. Kempf was placed on suicide watch for drug withdrawal, not because he was suicidal. (ECF No. 104 at 6-7).

In *Woloszyn*, Richard Woloszyn, the decedent, was arrested on July 21, 1999 and charged with attempted burglary. *Woloszyn,* 396 F.3d at 316. Upon his arrest, Woloszyn was noted to be in good spirits; however, at the time he was examined by the nurse, Woloszyn claimed to be under the influence of drugs. *Id*. at 316-17. During her assessment, the nurse noted that Woloszyn no longer appeared to be under the influence of drugs or alcohol. *Id*. Woloszyn said that he was not being treated by a psychiatrist and had no psychiatric history. *Id*. He did not request a counselor or physician at any point during his medical assessment. *Id*. The nurse did not believe that Woloszyn should be placed on suicide watch, as there was no indication that he intended to harm himself. *Id*. On the evening of July 21, 1999, the same day as his arrest, Woloszyn was found hanging in his cell, and he ultimately died at the hospital. *Id*. at 318. The Court of Appeals for the Third Circuit affirmed the district court's grant of summary judgment in favor of the defendant on the estate's § 1983 claim, *id*. at 322-23, 326, holding that mood swings and drug and alcohol influence, *without more*, were insufficient to demonstrate that Woloszyn possessed a particular vulnerability to suicide and that the official should have been aware of it. *Id*. (emphasis added). The appellate court explained that statements concerning feelings of failure and remorse and discussions concerning the decedent's drug and alcohol history, *without more*, are insufficient to show that the decedent exhibited a strong likelihood, rather than a mere possibility, of suicide and that these statements did not create a genuine issue of material fact with respect to the decedent's particular vulnerability to suicide. *Id.* at 322-23.

In *Palakovic*, the Court of Appeals for the Third Circuit recently determined whether a prisoner with a history of mental illness exhibited a particular vulnerability to suicide. The

decedent in that case, Brandon Palakovic had been diagnosed with numerous mental disorders and had a history of suicide attempts and self-injury. *Palakovic*, 854 F.3d at 216. Based upon his history, Mr. Palakovic was labeled at "Stability Rating D," was prescribed antidepressant medication, seen by psychology staff on three occasions during his fifteen-month imprisonment,[22] and placed on a mental health roster. *Id.* In *Palakovic*, the court explained:

> When a mentally ill, depressed person has attempted to kill himself multiple times, has engaged in self-harm, declares he has been thinking about killing and harming himself, and has made an actual plan of how he would carry out his own suicide, it cannot be said as a matter of law that the risk of suicide is nothing more than a "mere possibility."

*Palakovic,* 854 F.3d at 230 (citing *Woloszyn,* 396 F.3d at 322 (quoting *Colburn II,* 946 F.2d at 1024)). Similarly, Mr. Kempf had been diagnosed with major depressive disorder, suicide ideation, opioid dependence, and drug withdrawal. Mr. Kempf had also been classified as a "Level II High" suicide risk and was prescribed antidepressant medication by both the hospital and Dr. Kolli. (CCSMF ¶¶ 10, 39). (ECF No. 83-2 [Suicide Prevention Screening Questionnaire]). His expressed suicide plan related to the use of drugs, which he also relapsed on within the four days between his hospital discharge on January 2, 2015, and his detention on January 6, 2015.

Unlike *Woloszyn*, the record in the case at hand presents evidence of Mr. Kempf's particular vulnerability to suicide that rises beyond mere drug withdrawal and statements concerning remorse or failure. In addition to drug withdrawal and anxiety, Mr. Kempf had just been released from the hospital, because he was "suicidal with plans to shoot himself up on drugs to kill himself," (CCSMF ¶ 7), and had been diagnosed with major depressive disorder and opiate dependence. (CCSMF ¶ 10). Upon being discharged from the hospital, Mr. Kempf failed to take his newly prescribed medications, relapsed on heroin, and was detained. (CCSMF ¶¶ 12, 13). Mr.

---

[22] Palakovic was sentenced to a 16-48 month term of imprisonment, beginning in April 2011. He committed suicide in July 2012. *Palakovic*, 854 F.3d at 216.

Kempf informed WCCF staff of his recent hospitalization, as indicated on the Health Care Screening Form, and was placed on suicide watch immediately after being detained. (CCSMF ¶ 23). (ECF No. 83-2 [Health Care Screening Form]. Additionally, the Suicide Prevention Screening Questionnaire categorized Mr. Kempf as a "High" suicide risk. (ECF No. 83-2 [Suicide Prevention Screening Questionnaire]). Recognizing that Mr. Kempf needed to see a psychiatrist, nurses at WCCF provided Mr. Kempf's name to Dr. Kolli for an appointment. (CCSMF ¶ 28). Mr. Kempf was placed on suicide watch for two days until Dr. Kolli removed him from the suicide watch and precautions. (CCSMF ¶¶ 24, 42). Although this case is perhaps not quite as extreme as the facts in *Palakovic*, the court concludes that, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find in favor of plaintiff and defendant is not entitled to summary judgment on the issue of particular vulnerability to suicide. Under the circumstances, a jury will need to determine whether Mr. Kempf had a serious medical and psychiatric need – a particular vulnerability to suicide.

### C. Deliberate Indifference to Serious Medical Need

#### 1. Deliberate Indifference Standard

The court needs to determine whether there is sufficient evidence from which a reasonable jury could find that Dr. Kolli acted with deliberate indifference toward Mr. Kempf's serious medical and psychiatric needs. The two prong test for deliberate indifference stems from *Estelle v. Gamble*, 429 U.S. at 105-06. "First, plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.'" *Estate of Thomas*, 194 F. Supp. 3d at 370 (citing *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002) (citing *Wilson v. Seiter*, 501 U.S.

294, 298 (1991))).  "Because our § 1983 jurisprudence in custodial suicides borrows the term 'deliberate indifference' from Eighth Amendment jurisprudence, 'deliberate indifference' may be equivalent to the 'should have known' element required for § 1983 liability under the Fourteenth Amendment pursuant to *Colburn I* and *II."  Woloszyn*, 396 F.3d at 321.

Deliberate indifference has been found, for example, when an official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  *Innis v. Wilson*, 334 F. App'x 454, 456 (3d Cir. 2009) (citing *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999)).  Prison officials are not permitted to either deny "reasonable requests" for medical treatment **or** opt for "easier and less efficacious" treatment plans.  *Palakovic*, 854 F.3d at 228.

With respect to disputes over adequate medical treatment, "federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims which sound in state tort law," *Palakovic*, 854 F.3d at 228 (citing *United States ex rel. Walker v. Fayette Cty.,* 599 F.2d 573, 575 n.2 (3d Cir. 1979) (internal quotations and citation omitted)), because questions of medical treatment remain "a question of sound professional judgment."  *Palakovic*, 854 F.3d at 228 (citing *Pierce,* 612 F.2d at 762).  Simple disagreement about the proper course of medical treatment is insufficient to establish deliberate indifference.  *Pearson*, 850 F.3d at 535 (citing *Lanzaro*, 834 F.2d at 346).  Deliberate indifference is a higher standard than negligence and may be difficult to establish, because prison medical officials have leeway in diagnosing and treating inmates.  *Estelle,* 429 U.S. at 105-06; *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993).  Thus, a mere violation of the "standard of care," such as negligence, will not suffice to rise to the level of a constitutional infringement.  *Pearson*, 850 F.3d at 538 (citing *Estelle,* 429 U.S. at 106).

The Supreme Court in *Estelle* elaborated:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege *acts or omissions sufficiently harmful* to evidence deliberate indifference to serious medical needs.

*Estelle,* 429 U.S. at 106 (emphasis added).

A complaint that a prison or jail medical official "should have ordered additional observation is no more than a 'mere disagreement as to the proper medical treatment' that does not 'support a claim of [a constitutional] violation,'" *Pearson,* 850 F.3d at 543 (citing *Lanzaro,* 834 F.2d at 346), **unless** the defendant's "response *so deviated* from professional standards of care that it amounted to deliberate indifference." *Pearson,* 850 F.3d at 541 (emphasis added). "[L]iability may be imposed only when the decision by the professional is *such a substantial departure* from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982) (emphasis added).

The courts, in assessing a § 1983 claim, "presume that the treatment of a prisoner is proper *absent evidence* that it violates professional standards of care." *Pearson*, 850 F.3d at 535 (emphasis added); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) (citing *Youngberg*, 457 U.S. at 322-23 (1982)). To support liability, the plaintiff must show the prison or jail official had a "consciousness of a risk." *Farmer*, 511 U.S. at 840; *Palakovic*, 854 F.3d at 228. "Deliberate indifference requires that prison officials know of an excessive risk to an inmate's health or safety and affirmatively disregard that risk." *Estate of Thomas*, 194 F. Supp. 3d at 371-72; *see Innis*, 334 F. App'x at 456 (citing *Farmer*, 511 U.S. at 835–38). "When facts have been pled which, if proven, would demonstrate that the prison officials actually knew of the suicidal

tendencies of a particular prisoner, and ignored their responsibility to take reasonable precautions, the complaint has survived dismissal." *Freedman*, 853 F.2d at 1115.

With respect to § 1983 claims, courts consider, for example, a patient's history of suicidal propensities, the decedent's diagnosis upon detention, suicide rating, and mental health status in determining whether a prison official has acted with deliberate indifference. *Palakovic,* 854 F.3d at 230. Courts, however, are not permitted to "infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care." *Freedman*, 853 F.2d at 1115. While prison officials cannot guarantee that prisoners will not commit suicide, officials nevertheless are obligated by the Fourteenth Amendment to not act with reckless indifference to an inmate's vulnerability if that vulnerability is known or should be known by the official. *Palakovic,* 854 F.3d at 222 (citing *Colburn I,* 838 F.2d at 669 ("[I]f such officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability.")). If a jail official has *actual knowledge* of a detainee's history of suicide attempts or a detainee's diagnosis that identifies suicidal propensities, the knowledge requirement of the particular vulnerability to suicide element is satisfied. *Palakovic,* 854 F.3d at 222 (citing *Colburn II,* 946 F.2d at 1025 n.1); *Brandt v. PrimeCare Medical, Inc.*, Civil No. 1:11-CV-1692, 2013 WL 3863936, at *3 (M.D. Pa. July 24, 2013). "'When the factual scenario presented by a plaintiff suggests that [the defendant] *should have known* that a [detainee] was a suicide risk, and failed to take *necessary* and *available* precautions to protect the [detainee] from self-inflicted wounds' the claim will survive." *Francis v. Northumberland Cty.*, 636 F. Supp. 2d 368, 385 (M.D. Pa. 2009) (emphasis added) (citing *Tatsch-Corbin*, 561 F. Supp. 2d. at 543-44 (citing *Freedman,* 853 F.2d at 1115)).

## 2. Deliberate Indifference Analysis

### a. Standard

Although Dr. Kolli prescribed a course of treatment that did not ultimately prove successful, that is not the test. The court must consider whether a reasonable jury could find from the record as a whole evidence sufficient to establish Dr. Kolli's deliberate indifference to Mr. Kempf's serious medical and psychiatric needs, bearing in mind that "[j]ail suicides present particularly difficult occasions for line drawing." *Freedman*, 853 F.2d at 1115.

The heart of plaintiff's claim with respect to deliberate indifference to Mr. Kempf's particular risk of suicide is that Dr. Kolli showed "gross disregard" of Mr. Kempf's medical and psychiatric needs and violated Mr. Kempf's constitutional rights by failing to provide adequate suicide prevention measures under the circumstances, and in particular, deciding to take him off suicide watch. (ECF No. 50 ¶ 93).

Plaintiff's medical expert, Dr. Daniel, uses the words "gross disregard" as opposed to "deliberately indifferent" with respect to Dr. Kolli removing Mr. Kempf from suicide watch. *Id.* (ECF No. 83-2 [Expert report of A. E. Daniel, M.D., dated April 12, 2017]). Dr. Daniel, however, also uses the term "deliberate indifference" in his expert report, stating: "[t]he actions and inactions identified above, collectively and individually, indicating Deliberate Indifference to the psychiatric and substance abuse treatment needs of Mr. Kempf were the direct and proximate cause(s) of Mr. Kempf's suicide on February 2, 2015." (ECF No. 83-2 [Expert report of A. E. Daniel, M.D., dated April 12, 2017]).

With respect to use of any particular wording to distinguish between deliberate indifference and negligence standards, the Court of Appeals for the Third Circuit in *Williams* expressly declined to distinguish between "reckless indifference," "deliberate indifference," "gross negligence," or

"reckless disregard" in the context of Fourteenth Amendment violations, *Williams*, 891 F.2d at 464 n.10, and indicated that these terms refer to the state of mind required for a claim of deliberate indifference to a serious medical need. *Id.*[23]  Evidence of a "gross disregard" of Mr. Kempf's rights, when considering the totality of the evidence, also may support a finding of "deliberate indifference," and is relevant in determining whether Dr. Kolli's conduct "so deviated from the standard," *Pearson*, 850 F.3d at 541, or whether Dr. Kolli's acts or omissions were sufficiently harmful, *Estelle*, 429 U.S. at 106, to constitute deliberate indifference.

### b. Plaintiff's evidence

Plaintiff points to evidence in the record to demonstrate that Dr. Kolli exposed Mr. Kempf to a substantial risk of serious damage to his health, *Farmer*, 511 U.S. at 843, and thus acted with deliberate indifference with respect to: (1) Dr. Kolli's review of Mr. Kempf's medical records; (2) mental status assessment of Mr. Kempf; (3) Mr. Kempf's drug withdrawal; (4) failure to consult with WCCF correctional staff  on placing Mr. Kempf in solitary, segregated, administrative or restrictive confinement; and (5) a treatment plan that would require Mr. Kempf to consult with or be evaluated by Dr. Kolli on a more urgent basis.  (ECF No. 95 at 11-14).  Ultimately, plaintiff's expert, who reviewed the records, concluded that Dr. Kolli's failure to treat Mr. Kempf's drug addiction and withdrawal in the context of his recent suicidality and the prison setting showed deliberate indifference to Mr. Kempf's serious medical needs.

### c. Treatment backlog

Dr. Kolli argues that he was not responsible for any backlog of patients to be seen at WCCF.  While the existence of a backlog may hamper the effective delivery of medical health

---

[23] Specifically, the court stated in *Williams*:  "we have not attempted to draw distinctions among terms like 'reckless indifference,' 'deliberate indifference,' 'gross negligence,' or 'reckless disregard' in this context.  We decline to do so in this opinion, and will, therefore, use the term 'deliberate indifference' to refer to the type of conduct or state of mind described by these terms collectively."  891 F.2d at 464 n.10.

care, *Brown v. Plata*, 563 U.S. 493, 520 (2011), there is nothing to suggest that Dr. Kolli had any responsibility for the backlog. Because nurses at the facility would provide Dr. Kolli with a list of patients to be seen (CCSMF ¶ 28), the mere issue of a backlog itself would not be reflective of any deliberate indifference by Dr. Kolli. Dr. Daniel suggests that the existence of a backlog at the prison demonstrates that Dr. Kolli's treatment fell below the standard of care, as it created a delay in Mr. Kempf's treatment. (ECF No. 83-2 [Expert report of A. E. Daniel, M.D., dated April 12, 2017]). Because Dr. Kolli has worked at WCCF since 2008 (CCSMF ¶ 26), a reasonable jury could infer that Dr. Kolli possessed situational awareness of the backlog's existence, and although Dr. Kolli may not be responsible for the backlog, the existence of a backlog would not prohibit a finding of deliberate indifference under the circumstances and the jury could consider Dr. Kolli's decision not to schedule an earlier follow-up appointment for Mr. Kempf in determining that he was deliberately indifferent to Mr. Kempf's serious medical and mental health needs.

### d. Confinement status

In *Palakovic*, the appellate court explored the components of deliberate indifference. The decedent, Brandon Palakovic, had been diagnosed with numerous mental disorders, had a history of suicide attempts, had been prescribed antidepressant medication, was seen by psychology staff on three occasions during his fifteen-months of imprisonment, and was placed on a mental health roster. *Palakovic*, 854 F.3d at 216. The prison commonly handled mentally ill prisoners by repeatedly placing them in solitary confinement. *Id*. Although prison officials were aware of the conditions of solitary confinement and knew about Mr. Palakovic's mental health issues, Mr. Palakovic was placed in solitary confinement for multiple 30-day stints, and he ultimately committed suicide while in that confinement. *Id*. at 217. In holding the prison officials were deliberately indifferent to the needs of Mr. Palakovic, the Court of Appeals for the Third Circuit

focused on the patient's mental health history, <u>as well as</u> the actions of the jail custodians in placing him in more restrictive confinement. *Id*. at 226.

In *Farmer v. Brennan*, the Court held "that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Plaintiff does not allege that Mr. Kempf's confinement was inhumane; rather, plaintiff argues that Mr. Kempf should not have been in solitary confinement or PHC due to his mental health history.

With respect to the kind of confinement in which Mr. Kempf was placed at the WCCF, plaintiff argues that Dr. Kolli would know the risks of placing Mr. Kempf, who recently expressed suicide ideation, in solitary or administrative segregation and failed to advise prison staff to either not place Mr. Kempf in that confinement or to discuss the issue with Dr. Kolli first. (ECF 95 at 18). Plaintiff's approach appears to suggest that inmates with a particular vulnerability to suicide should never be placed in solitary confinement; however, the record is insufficient to support such an assertion.

Defendant points out that the record lacks evidence that Mr. Kempf actually was placed in solitary confinement, (ECF 104 at 4-5), or that Dr. Kolli was in control of such assignments. Captain Fletcher's report explains that Mr. Kempf was placed in more restrictive confinement in PHC, and had been moved to various cells throughout his detention. (ECF No. 102, Ex. 8 [Washington Cty. Jail Suicide Investigation – Kempf]). The purpose of moving Mr. Kempf initially was to prevent further harassment by other detainees, and he was moved again due to his back-to-back write-ups. *Id*. The record, however, ultimately is unclear whether Mr. Kempf was

placed in solitary confinement, but—viewing the evidence and reasonable inferences therefrom in the light most favorable to the plaintiff—it supports that Mr. Kempf was in and out of some form of restrictive housing.

Dr. Kolli testified that he is not part of the housing and disciplinary processes at WCCF and had not been informed by others that Mr. Kempf was placed in confinement. (Kolli Dep. 46:1-7). Yet, Dr. Kolli, who had worked at WCCF since 2008, (CCSMF ¶ 26), did have the ability to remove a detainee from suicide watch, and could, conversely, place a detainee on suicide watch. Therefore, a reasonable jury could find that Dr. Kolli was aware of the prison setting in which the detainee was treated and failed to provide any direction with respect to restrictive confinement. The court does not consider that Dr. Kolli's failure to provide a recommendation with respect to Mr. Kempf's confinement is itself deliberate indifference, and alone such a consideration would be insufficient. This failure, however, is a consideration that provides additional support for a reasonable jury to find that Dr. Kolli acted with deliberate indifference.

### e. Drug withdrawal

Defendant, citing to *Estate of Thomas*, 194 F. Supp. 3d at 362, argues that Dr. Kolli should not be held liable even though he was aware that Mr. Kempf may have had a prior suicide attempt, had a history of depressive disorder, suffered from opioid dependence and demonstrated anxiety that can be a symptom of experiencing opioid withdrawal. (ECF No. 84 at 6). Defendant asserts that there is no evidence that Mr. Kempf was suicidal or exhibited unusual behaviors at the time Dr. Kolli evaluated and assessed him. *Id*. Thus, Dr. Kolli contends that he could not be held liable under the deliberate indifference standard, as substance withdrawal is not a serious medical need, (ECF No. 84 at 8), and Dr. Kolli addressed what he contends was Mr. Kempf's only withdrawal symptom – anxiety. (ECF No. 84 at 9).

With respect to Mr. Kempf's opioid dependence, plaintiff argues that Dr. Kolli knew about and failed to make any efforts to treat Mr. Kempf for opioid dependence[24] in the context of his hospitalization for suicidality and opioid withdrawal and failed to review assessments and request medical records, all of which supports that Dr. Kolli was deliberately indifferent to Mr. Kempf's serious medical need. In arguing that Mr. Kempf did not have a serious medical need, Dr. Kolli points to the fact that Mr. Kempf was placed on suicide watch for the drug withdrawal. (ECF No. 104 at 6-7). He, however, did not address his failure to treat the drug withdrawal and addiction and his removal of Mr. Kempf from suicide watch in that context. Dr. Kolli's failure to address in any manner Mr. Kempf's opioid dependence and withdrawal supports Dr. Daniel's expert opinion.

In *Colburn II*, 946 F.2d at 1026, the court was unwilling to equate intoxication with a particular vulnerability to suicide that would be known to the prison medical official. While intoxication and drug withdrawal <u>alone</u> might not support a claim of deliberate indifference, the court must assess the record in its entirety, and it is clear that the evidence in this case presents more than just an issue of drug withdrawal.

Unlike in the case at hand, the prison medical officials in *Estate of Thomas* conducted a drug screen for opiates, but because the screen was negative, they provided no treatment for withdrawal. *Id*. at 362. Although the officials did not test for cocaine, which the detainee indicated he had taken, they did not do so because there was no protocol for cocaine detoxification. *Id*. Notably, the decedent in *Estate of Thomas* appeared to only have a family history of suicide, and

---

[24] Plaintiff cites to a letter written by Mr. Kempf requesting the opportunity to join a rehabilitation treatment program (ECF No. 102, Ex. 6 [Kempf Letter Re Seeking Drug Treatment Assistance]); however, the letter is undated and undirected, discusses drug withdrawal but makes no mention of suicide or suicidal ideation, and there is no evidence that this letter was sent to or received by Dr. Kolli or any other member of the prison staff. With no evidence of receipt or knowledge of this letter by Dr. Kolli, it does not support that Dr. Kolli either denied or ignored any request by Mr. Kempf for treatment.

the evidence did not show that the decedent had any increased risk of suicide. *Id*. at 362. Nevertheless, in *Estate of Thomas* the prison medical staff took the affirmative steps to address the issue of drug withdrawal by giving the decedent a drug screen test for opioids, which was negative. *Id*. Here, as pointed out by plaintiff's expert Dr. Daniel, Dr. Kolli never ordered any drug screen or otherwise attempted to address drug withdrawal in the context of Mr. Kempf's mental health condition, and therefore, he ordered no treatment for withdrawal. Plaintiff produced evidence, in addition to Dr. Daniel's report, that Mr. Kempf had just been hospitalized for suicidality that specifically included suicide by drug overdose, but was removed from suicide watch by Dr. Kolli without any drug screen. Thus, unlike the plaintiff in *Estate of Thomas*, plaintiff in this case produced both expert and other record evidence, as opposed to the mere conclusory factual assertions and argument. 194 F. Supp. 3d at 363.

### f. Consideration of co-existing disorders and the records

Defendant explains that, although depression has been characterized by the Third Circuit Court of Appeals as a serious medical need, he evaluated and assessed Mr. Kempf and prescribed medications for it, and therefore, he is not liable. *Id*. Plaintiff again points to Dr. Kolli's failure to consider Mr. Kempf's psychiatric condition in light of the opioid dependence, drug withdrawal, and recent suicidality and Dr. Kolli's failure to obtain and review the recent medical records, and provide shorter term follow-up under the circumstances.

Plaintiff cites to two decisions: *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307 (3d Cir. 2014), and *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990), to argue that Dr. Kolli's failure to assess Mr. Kempf's records supports deliberate indifference. (ECF No. 95 at 11). Defendant contends that *Barkes* and *Greason* do not apply because they "relate to circumstances

involving the defendants' failure to <u>acknowledge</u> the inmate's mental health history." (ECF No. 104 at 4) (emphasis added).

In *Barkes* the court did not discuss whether prison medical staff are required to review an inmate's medical records; rather, the case concerned deliberate indifference toward the prisoner's serious medical needs based upon the policies and procedures instituted by prison medical staff. *Barkes*, 766 F.3d at 310, 330. While it is true that Dr. Kolli did not fail to acknowledge that Mr. Kempf had a mental health history, he did not make an effort to inform himself with respect to that significant history, particularly Mr. Kempf's suicidality, or seek review of the very recent treatment records from the hospital.

In *Greason*, which concerned a claim for deliberate indifference to an inmate's psychiatric needs in the context of the suicide of that inmate, who had an extensive history of mental illness during his incarceration, the Court of Appeals for the Eleventh Circuit affirmed the denial of the defendants' motion seeking summary judgment on qualified immunity grounds.[25] 891 F.2d at 831. The defendant psychiatrist claimed that his conduct might amount to negligence but was insufficient to establish deliberate indifference. *Id.* at 835. The court rejected the psychiatrist's position, holding that a reasonable jury could find that the psychiatrist acted with deliberate indifference when, after the first visit, he abruptly discontinued Greason's antidepressant medication without reviewing his clinical file or conducting a mental status examination. *Id.*

Of note, the court in *Gleason* explored conflicting expert testimony with respect to inadequate health care deliberate indifference claims and determined that "the conflict among the experts concerning the propriety of the psychiatrist's professional judgment calls had to be

---

[25] An appellate court has jurisdiction to review an interlocutory appeal of an order denying qualified immunity. *Greason*, 891 F.2d at 831 n. 4 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

resolved by the jury." *Greason*, 891 F.2d at 835 (citing *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)).  Here, plaintiff points to Dr. Daniel's opinion to likewise show a conflict in expert reports which presents a matter for determination by the jury.

Dr. Kolli did not obtain or review Mr. Kempf's recent hospitalization records with respect to his suicide ideation and plan.  (CCSMF ¶ 20).  While that failure alone is insufficient to hold Dr. Kolli liable under the deliberate indifference standard, Dr. Kolli also did not review the medical intake questionnaire conducted at WCCF, (CCSMF ¶¶ 17, 18), and testified that he did not consult WCCF policies and procedures with respect to suicide risk, (Kolli Dep. 46:17-48:15), as discussed further below.

Mr. Kempf had two diagnoses at the time of his hospital discharge: (1) major depressive disorder; and (2) opiate dependence.  (CCSMF ¶ 10).  With respect to Mr. Kempf's depression, the hospital prescribed Thorazine and Celexa, (CCSMF ¶ 10), and attempted to address Mr. Kempf's drug abuse by providing detoxification.  Mr. Kempf disclosed to Dr. Kolli that he had been recently hospitalized for depression <u>and</u> opioid dependence.  (CCSMF ¶ 22).  Despite being told about Mr. Kempf's hospitalization and that it involved suicidal ideation, Dr. Kolli did not attempt to obtain or review the hospital records or medical intake documents prior to determining a treatment plan for Mr. Kempf, (CCSMF ¶¶ 17-18), and did not address his drug withdrawal in that context.

Dr. Daniel points out that Dr. Kolli, unlike the hospital, failed to address substance abuse treatment for Mr. Kempf and failed to take efforts to detox Mr. Kempf, despite his issues with suicidality, major depressive disorder, and active withdrawal.  (ECF No. 83-2, Ex. L).   Dr. Kolli, who knew about Mr. Kempf's hospital diagnoses of major depressive disorder and opiate dependence, and relapse, prescribed to Mr. Kempf Celexa and Thoraxine, but, without ordering a

urine drug screening or a drug detoxification treatment, immediately took him off suicide watch. (ECF No. 102, Ex. 3 [Dr. Kolli-Kempf Consult Notes]). Based upon this evidence, Dr. Daniel opined that Dr. Kolli's conduct was a gross deviation of the standard of care, including within the prison context.

Standing alone, "the failure to access and review medical records and the failure to evaluate adequately [a decedent's] suicidality does not constitute gross negligence." *Ponzini v. PrimeCare Medical, Inc.*, 269 F. Supp. 3d 444, 545 (M.D. Pa. 2017), *appeal docketed*, No. 17-3133, (3d Cir. Aug. 30, 2017) (internal citations omitted). Given the record before this court, including Dr. Daniel's expert report, a reasonable jury could find that Dr. Kolli's failure to access and review medical records, <u>together with</u> the other evidence of record, supports a finding of deliberate indifference.

In *Robey v. Chester County*, the court observed that:

> [R]easonable jurors could . . . find that [the psychologist] was deliberately indifferent to the serious suicidal problems of decedent when . . . two days after the suicide watch was removed and over a month before his suicide, [the psychologist] received [the decedent's] medical report[26] form complaining of "bad nerves" and other symptoms and then brushed off his cry for help.

*Robey v. Chester Cty.*, 946 F. Supp. 333, 338 (E.D. Pa. 1996). In the case at hand, although Dr. Kolli generally responded to Mr. Kempf's depression and anxiety by providing a course of treatment – prescription drugs – Dr. Daniel's opinion would be sufficient for a reasonable jury to find that he did so with no reasonable follow-up to assess its efficacy, and he ignored the opioid dependence and withdrawal from which Mr. Kempf was suffering. Indeed, Mr. Kempf's sister and his friend, Mr. Greene, both testified that Mr. Kempf continued to suffer from active

---

[26] The medical report referred to in *Robey* is a record from the examination of the decedent, Norman Robey ("Robey"), by Robyn Martin ("Martin"), a psychologist who was contracted with the prison. Martin noted that Robey "complained of 'bad nerves' and 'head ackes' [sic]." *Robey*, 946 F. Supp. at 335.

withdrawal shortly before his suicide. Additionally, Dr. Penn's expert opinion with respect to the standard of care for follow-up psychiatric evaluation within the jail setting did not provide what would meet the standard of care specifically for a patient such as Mr. Kempf.

Dr. Kolli, upon examining Mr. Kempf on January 8, 2015, was aware of Mr. Kempf's opiate dependence, withdrawal, and recent issue with suicide, yet in that context did not order a urine drug screen or initiate a proper detoxification regimen as part of Mr. Kempf's treatment, opting instead to remove Mr. Kempf from suicide watch and monitoring. Defendant's medical expert also admits the co-occurrence of depression and substance withdrawal. As plaintiff's medical expert points out, Dr. Kolli ignored the co-occurrence and provided no treatment for it. A reasonable jury could find that, by not addressing all of Mr. Kempf's co-occurring disorders and leaving him to his own devices for three months without an earlier follow-up, Dr. Kolli "brushed off" Mr. Kempf's "cry for help" and opted for an "easier and less efficacious" course of treatment for Mr. Kempf's co-occurring disorders, which would support a finding by a reasonable jury that Dr. Kolli acted with deliberate indifference to Mr. Kempf's serious medical need. *Palakovic*, 854 F.3d at 228.

### g. Policies and procedures

Plaintiff argues that Dr. Kolli exhibited deliberate indifference when he failed to familiarize himself with the proper jail policies and procedures. (ECF No. 95 at 18). Dr. Kolli testified that he had never seen, and thus had not familiarized himself with, the Washington County Jail Suicide Prevention Policy or Procedure and that he did not consult jail suicide prevention policy or procedure assessment levels for suicide detainees, (Kolli Dep.46:17-48:15), that rated Mr. Kempf as a high suicide risk. *Id.* at 20:8-12.

In *Francis v. Northumberland County*, 636 F. Supp. 2d 368, 380 (M.D. Pa. 2009), Ryan Francis, who lost his mother, girlfriend, and three others in house fire, was not permitted to be a pallbearer at his girlfriend's funeral. At the funeral, he became belligerent and was arrested and charged with disorderly conduct, making terroristic threats, and drug possession. *Id*. The police informed the lieutenant that Mr. Francis had expressed suicidal ideation, and the lieutenant placed him on suicide watch. *Id*. A psychiatrist, Dr. Frederick Maue, was made aware of the situation and performed a two-hour emergency psychiatric evaluation of Mr. Francis. *Id*. Dr. Maue noted that Mr. Francis was suffering from depression, was having difficulty sleeping, felt guilty as the lone house fire survivor, and had prior multiple suicide attempts and suicide ideation. *Id.* Dr. Maue characterized Mr. Francis as a "10," indicating "most suicidal," prescribed antianxiety and antidepression medication for Mr. Francis, and ordered an evaluation the following day with a prison health counselor. *Id*. Dr. Maue "indicated that it would be in Francis' best interest to be transferred to a psychiatric hospital and that he would attempt to effectuate such a transfer." *Id*. The transfer, however, could not occur unless the charges against Mr. Francis were dropped. *Id*. at 381. As a result, Mr. Francis was placed in a cell with another inmate. *Id*.

The following day, Dr. Maue called the warden to explain Mr. Francis' need for suicide watch and transfer to the psychiatric hospital. *Id*. The prison nurse, who evaluated Mr. Francis, remarked that he was "laughing and playing cards" and "was no longer a threat to himself or others." *Id*. The next day, Mr. Francis committed suicide in his cell "by fastening a bed sheet to a window fixture and strangling himself." *Id*. at 383. The court held that Dr. Maue could be found liable in his individual capacity under the § 1983 deliberate indifference standard, stating:

> [T]here is ample evidence from which a reasonable jury could conclude that [Dr. Maue] acted with deliberate or reckless indifference in treating Mr. Francis. . . . Dr. Maue, by his own admission, was acutely aware of Mr. Francis' severe suicidality. Given his extensive experience with treating inmates, we believe that a

reasonable jury could conclude that Dr. Maue should have been aware that there are very discrete protocols associated with the varying levels of suicide watch employed at prisons in [Pennsylvania]. Nonetheless, there is record evidence from which a reasonable jury could infer that Dr. Maue <u>failed to familiarize himself with the niceties of the protocols</u> implemented at NCP. As a result, Dr. Maue <u>failed to correctly communicate</u> to NCP officials the appropriate suicide watch level under which Mr. Francis should have been monitored. Indeed, Dr. Maue instituted a suicide watch level for Mr. Francis that was less rigorous and less exacting than the watch level that he determined to be appropriate, given Mr. Francis' extreme suicidality. A reasonable jury could infer that these actions were the first dominoes in a series of unfortunate events that ultimately culminated in Mr. Francis ending his own life.

*Id*. at 386-87 (emphasis added).

Similar to the protocols in *Francis*, the WCCJ suicide prevention policies and procedures provide preventative protocols associated with varying levels of suicide risk. (ECF No. 102 at 157-60). The case at hand does not involve a failure to communicate correctly a level of suicide watch; rather, it involves Dr. Kolli removing Mr. Kempf from <u>all</u> suicide watch levels even though Mr. Kempf: had been hospitalized for depression and opioid dependence just prior to his detention with his chief complaint upon admission to the hospital being that he was "suicidal with plans to shoot up on drugs and kill himself," (CCSMF ¶ 7); was "withdrawing from drugs" at the time of his discharge on January 2, 2015; and had relapsed. (CCSMF ¶ 11). Although alone it may not be a significant factor, a reasonable jury could find the failure to know about and follow the policies and procedures, together with the other evidence of record, supports a finding of deliberate indifference.

### h. Sufficiency of evidence

Recognizing that this case involves very difficult line-drawing, the court ultimately concludes there is sufficient evidence for a reasonable jury to find that Dr. Kolli was grossly negligent and substantially departed from the standard of care. While no single act by Dr. Kolli and no single kind of evidence alone in this case would be sufficient to amount to deliberate

indifference, the court, upon examining the record evidence, concludes based on the totality of the evidence adduced that the evidence is sufficient to support the conclusion that a reasonable jury could render a verdict in favor of plaintiff on the § 1983 claim for violation of Mr. Kempf's Fourteenth Amendment rights by Dr. Kolli. In sum, the totality of the evidence viewed in the light most favorable to plaintiff, including Dr. Kolli's i) failure to familiarize himself with the policies and procedures and review the intake forms; ii) removing from suicide watch Mr. Kempf, who had a history of major depressive disorder, opiate dependence and very recent hospitalization for suicidality; iii) failing to seek the hospital records; iv) starting Mr. Kempf on new medication for depression and anxiety with only a three-month follow-up; and v) failure to treat Mr. Kempf's drug addiction and withdrawal; as well as Dr. Daniel's expert opinion that Dr. Kolli's conduct was a significant departure from the standard of care under the circumstances and exhibited gross disregard and deliberate indifference, is overall indicative of and together sufficient to support a finding by the jury of deliberate indifference to Mr. Kempf's serious medical needs. *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1146 (3d Cir. 1990); *Williams*, 891 F.2d at 464 n. 10.

## VII.   <u>CONCLUSION</u>

Viewing the totality of the evidence in the light most favorable to plaintiff as the nonmoving party, a reasonable jury might find that Mr. Kempf exhibited a particular vulnerability to suicide and that Dr. Kolli acted with deliberate indifference toward Mr. Kempf's serious medical and mental health needs—his particular vulnerability to suicide. A jury will need to determine the disputed issues of fact, particularly how to resolve the conflict between the opinions of the experts.

Based upon the foregoing analysis, plaintiff's motion to strike will be denied, defendant's motion for summary judgment on the first Count Five will be denied, and the court will continue

to exercise its supplemental jurisdiction with respect to the Pennsylvania law claims under Count

Six and under the second Counts Four and Five.

An appropriate order follows.

By the court:

Dated:  September 12, 2018                    /s/ Joy Flowers Conti
                                             Joy Flowers Conti
                                             Chief United States District Judge